**HEADNOTE**: *Gables Construction, Inc. v. Red Coats*, *Inc., et al* No. 907, September Term, 2017.  Opinion by Wright, Alexander.


**UCATA – THIRD PARTY CONTRIBUTION - CONTRACTUAL WAIVERS - WAIVERS OF SUBROGATION**

Contractual waivers of subrogation do not shield a contracting party from third-party contribution and direct liability under the Maryland Uniform Contribution Among Joint-Tortfeasors Act ("UCATA").

Circuit Court for Montgomery County
Case No. 397964

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 907

September Term, 2017

_____

GABLES CONSTRUCTION, INC.

v.

RED COATS, INC., ET AL.

_____

Fader, C.J.,
Wright,
Eyler, James R.,
 (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Wright, J.
_____

Filed:  May 10, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal presents a question of first impression in Maryland: whether, and under what circumstances, a contractual waiver can shield a contracting party from both third-party contribution and direct liability, in addition to other issues. We shall affirm the Circuit Court for Montgomery County's rulings and hold that a contractual waiver of subrogation does not bar contribution under the Maryland Uniform Contribution Among Joint Tort-Feasors Act ("UCATA"), but part ways with the jury verdict and hold that the contractual waiver in the Vendor Services Agreement ("VSA") and the settlement agreement and release controls the relationship between appellant, Gables Construction ("GCI"), and the appellees, Red Coats, Inc./Admiral ("Red Coats"), appellee, a security and fire watch company.

In the overnight hours between March 31, 2014, and April 1, 2014, a fire damaged a 139-unit apartment building (the "Project") that was nearing completion. The building sustained damages in excess of $22,150,000.00. Due to the fire, Upper Rock, Inc. ("Upper Rock"), the Project's owner, sued Red Coats, a security and fire watch company for gross negligence and breach of contract. In turn, Red Coats filed a third-party claim against GCI, the general contractor, seeking contribution under the UCATA in the circuit court. GCI responded by filing a Motion for Summary Judgment, which proved unsuccessful.

After a hearing on April 1, 2016, the circuit court found that a waiver of subrogation involved in a contract between GCI and Upper Rock limited any indemnification claims, but did not limit GCI's liability for contribution. A jury found

that GCI was a joint-tortfeasor which was liable for damages, and the court awarded $7,000,000.00 to Red Coats, half of the damages owed to Upper Rock. GCI timely appealed and presents the following questions for our review:

I. Whether the judgment should be reversed because GCI is not a "joint tortfeasor" under the UCATA.

II. Whether the judgment should be reduced because Red Coats contractually waived claims against [GCI] to the extent covered by insurance.

III. Whether the trial court erred when it entered partial summary judgment on the issue of [GCI's] negligence.

IV. Whether the trial court erred in giving ambiguous, misleading, and confusing answers to questions asked by the deliberating jury.

V. Whether the trial court erred in granting the motions for judgment made against [GCI] by Retana Contractors and Rosa's Painting.

VI. Whether the trial court erred in declining to give the superseding cause instruction.

We answer question II in the affirmative and question I, III, IV, V, and VI in the negative and remand for proceedings consistent with this opinion. For the reasons to follow, we will affirm in part and reverse in part the circuit court's judgments.

**FACTUAL AND PROCEDURAL BACKGROUND**

*The Prime Contract*

In 2012, Upper Rock and GCI entered into a Document A102-2007 Standard Form of Agreement Between Owner and Contractor Contract (the "Prime Contract") to govern the construction of a complex, which included Building G, a 139-unit apartment

2

building.  The Prime Contract listed Upper Rock as the Owner and GCI as the

Contractor.[1]

Section 3.18.1 of the General Conditions of the Prime Contract contained an

indemnification provision which read:

> To the full extent permitted by law the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.  Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section[.]

Section 10.2 of the General Conditions which governed the safety of persons and

property, stated, in relevant part:

> 10.2.4 When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.
>
>         \*        \*        \*
>
> 10.2.6 The Contractor shall promptly remedy damage and loss (with respect to any damage or loss insured under property insurance required by the Contract Documents, Owner shall provide the insurance proceeds therefor to Contractor) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in party by the Contractor, a Subcontractor, a Sub-subcontractor or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor

---

[1] The record reflects that Upper Rock and GCI share the same business address.

is responsible under Sections 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of this Contractor are in addition to the Contractor's obligations under Section 3.18.

Section 11.1.2 required GCI to carry different types of insurance including Workers Compensation and Employers' Liability Insurance, and General Liability Insurance.[2] Section 11.3.7 included a Waiver of Subrogation, at issue in this case. The Waiver reads, in pertinent part:

> The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) any of their subcontractors, sub-subcontractors and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner and Contractor. Furthermore, if and to the extent Contractor has its personal property located on or about the site which is not covered by the insurance obtained pursuant to this Section 11.3.7, the Contractor waives and releases Owner from all rights or causes of action (including rights of recovery and subrogation) resulting from any loss or damage to such other property, regardless of whether the same is insured by the Contractor and regardless of whether the cause for such damage is due to the NEGLIGENCE OF THE OWNER. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise.

---

[2] Schedule 2 to the General Conditions mandated that the Contractor would procure and maintain the following insurance coverages: Workers Compensation and Employer's Liability Insurance, General Liability Insurance, Automobile Liability Insurance, Excess Liability Insurance, Builders "All Risk" Insurance, Owner's Rent Loss or Business Interruption Insurance, and Contractor's Pollution Liability Insurance.

4

(Emphasis in original).

> Notwithstanding anything to the contrary herein contained, in the event that either Owner or Contractor ("First Party") incurs a loss by fire or other casualty, which fire or other casualty shall have been caused in whole or in party by the negligence or acts or omissions of the other party or the other party's agents, contractors, employees or servants, then to the extent that the First Party is compensated by the Builder's Risk Insurance Coverage obtained pursuant to Section 11.3 or any other property insurance of the First Party applicable to the Project, then the First Party (for itself and its successors and assigns) hereby waives and releases any claim that it might have against the other party and no party shall have any rights against either Owner or Contractor by reason of any fire or casualty damage either by subrogation or assignment.

*The VSA between Gables Residential Services, Inc. ("GRSI") and Red Coats*

Gables Residential Services Incorporated ("GRSI"), the 100% owner of GCI, contracted with Red Coats, for the provision of fire watch and security services for the Project. This contract included a 2-page VSA and a 1-page Extra Coverage/Temporary Insurance Request Form.

The VSA provided, in relevant part:

> Vendors providing any type of good and/or service that require their company to send a representative to the apartment community must have a current certificate of insurance on file with Compliance Depot for general liability, auto liability, excess liability if applicable, and workers' compensation. All coverage shall be primary and non-contributory. The following parties must be added to the general liability policy as an additional insured as their interests may appear in regard to work performed by Vendor: GABLES RESIDENTIAL SERVICES, INC, ITS PARENT, MEMBERS, SUBSIDIARIES AND AFFILIATED COMPANIES; AND THEIR PARTNERS, JOINT VENTURERS; AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES. A waiver of subrogation shall apply in favor of the aforementioned parties on all policies as permitted by law.

(Internal quotations omitted).

The Extra Coverage/Temporary Request Form, signed by Christopher Hauska, GCI's project manager, indicated that the Red Coats officer was to "patrol the property to watch for unauthorized individuals coming on the property. No one should be on the property outside of work hours without prior authorization from Gables personnel." The form also listed GCI's point of contact as Oscar Ancheta, GCI's assistant superintendent for the Project. As adduced at trial, Red Coats services were necessary because GCI had previously had a Bobcat[3] stolen from the premises.

*The Fire at Building G*

In the overnight hours between March 31, 2014, and April 1, 2014, Building G caught fire, thirty days short of certification for occupancy. After the fire, several parties came to inspect the scene including a state trooper, Traveler's Insurance, and various causation experts, some of whom testified at trial. The parties dispute who placed the mushroom heaters in the hallway that led to the fire.[4]

Upper Rock filed a complaint with the Circuit Court for Montgomery County against Red Coats and Tamika Shelton, Red Coats' security guard on duty the night of

---

[3] A Bobcat is a small rigid frame, engine powered machine with lift arm used to attach a wide variety of labor saving tools and attachments.

[4] Throughout the case, we will be referring to "mushroom heaters." The mushroom heaters in this case were L.B. White's Workman Convection Construction heaters. The heaters look, quite literally, like mushrooms. Description of L.B. White's Workman Convection Heaters, L.B. White Workman, https://www.lbwhite.com/products/Construction-Heaters/Convection/ (last visited January 10, 2019).

the incident, seeking damages for $22,150,000.00, and alleging that both Red Coats and Shelton were the proximate and negligent cause of the building's destruction. Upper Rock did not name GCI as a party to the complaint. In the settlement of that legal action, Red Coats paid $14 million to Upper Rock, $4 million of which it paid out of pocket, with the remaining $10 million paid by its insurer, and conceded that it was a joint tortfeasor.

*Red Coats' Third-Party Contribution Claim*

After settling with Upper Rock, Red Coats and Shelton filed an Amended Third-Party Complaint against GCI, Retana Contractors, LLC ("Retana"), Rosa's Painting ("Rosa's") and C&R Carpentry ("C&R")[5] (collectively "the third-party defendants") alleging that were Red Coats and Shelton found to be liable to Upper Rock, the third-party defendants were liable to Red Coats by way of contribution or indemnification.

In response, GCI moved for summary judgment and argued that the VSA insulated GCI, as a named additional insured, from Red Coats' third-party complaint. GCI also denied joint tortfeasor status, averring that, at a minimum, Red Coats would need to plead that GCI was liable to Upper Rock for the same damages Upper Rock pursued against Red Coats.

---

[5] GCI subcontracted with Retana for the Project's drywall, metal framing, and painting work. Retana subcontracted the painting work to Rosa's. GCI subcontracted with BMC West Corporation for the doors, trim, and hardware for the Project, which, in turn, sub-subcontracted with C&R to provide the labor and materials for the installation of the wood trim.

7

At trial, Red Coats moved for partial summary judgment as to GCI's negligence. GCI conceded its breach of the standard of care by way of the testimony of Richard Kreimborg, its withdrawn standard of care expert. The circuit court questioned "[w]here's the testimony that says that your client did not breach the standard of care[,]" and asked "what's the factual question?" Counsel for GCI pointed to the fact that the testimony of an independent consultant, Donald Greene, *infra*, established that GCI's actions were reasonable related to the heaters and claimed that Red Coats did not have sufficient evidence establishing that GCI breached the standard of care. The court found that Kreimborg's testimony was "an admission of a party opponent," and that there was no genuine dispute of material fact regarding GCI's breach of the standard of care pursuant to Md. Rule 2-501.

*Testimony at Trial*

Blaine Wilson, the Executive Vice President for Corporate Human Resources for Red Coats, testified that Red Coats contracted with GRSI to "provide services during evening hours, approximately 5:00 p.m. to 6:00 a.m." Wilson testified that, initially, Red Coats was hired to patrol the exterior of the worksite to prevent thefts. Wilson confirmed that Shelton was on duty the evening the incident occurred, and that she performed her patrols as required under the contract. Wilson's testimony discredited GCI's testimony that one of its employees walked Shelton through Building G to show her where to patrol. In addition, Wilson testified that GCI never provided training for Shelton and never informed Red Coats that temporary mushroom heaters were in use. Finally, Wilson confirmed that Red Coats settled its suit with Upper Rock and paid $4 million out of

8

pocket. On cross-examination, Wilson stated that it was a policy of Red Coats that security officers could not go into buildings that were under construction.

Shelton testified that she had been on-duty the night in question, but that GCI never informed her that there were temporary mushroom heaters being used at the site. She also testified that GCI never ordered her to go inside the building. On cross-examination, Shelton testified that she received training on fire watch from Red Coats and that the "contractors were still there" when she arrived on the job.

William Olin, a fire investigator, testified that he investigated the causes and origin of the fire, but was unable to determine whether the fire was caused by electrical wiring. Michael Newberry, a Fire Investigator for Atlantic Fire, testified that it was his opinion that the cause of the fire was the mushroom heaters owned by GCI. Newberry also testified that the hallway was five feet and six inches wide and that the heaters required four feet of space between the nearest combustible. Newberry's testimony also established that four heaters were found on the fourth floor of Building G.

Brent Leisenring, a civil engineer with Robson Forensic, Inc., could not identify who placed the mushroom heater in the hallway but testified that GCI breached the relevant standard of care by failing to:

> 1. Perform and prepare a job hazard analysis and fire protection plan per [the National Fire Protection Association] ("NFPA") 241 [§§ 5.2.2 and 5.2.3].
>
> 2. Properly coordinate their Project specific requirements for fire watch, which should have been addressed with Red Coats.
>
> 3. Ensure that the temporary heating equipment was utilized in compliance with the equipment's operating instructions.

9

4.    Train their own workers pursuant to [Occupational Safety and Health Administration] ("OSHA").

5.    Place the heater in the proper place.

6.    Ensure that [Red Coats'] workers with responsibility for fire watch were properly trained

Jan Inguiagiato, a construction worker, testified that Travelers Insurance contacted his firm to assist with the loss after the fire. Inguiagiato physically inspected the building to ascertain "what work had been put into place at the time of the fire." He also testified that Red Coats' $14 million payout was "reasonable."

Mark Nelson, a forensic engineer, testified that a mushroom heater caused the damage to the building, and that a manual said that clearance from the top of the heater to the ceiling required a clearance of five feet and ten inches. Christopher Graham, an electrical engineer, testified that he could not find an electrical cause for the fire.

Next, the circuit court heard testimony from Retana employee, Julio Retana. Retana testified that none of the painters brought the mushroom heaters to the worksite and stated "I suppose somebody who worked for [GCI]" brought the heaters to Building G.

On June 5, 2017, the parties notified the circuit court that Red Coats had resolved its claims with Retana, Rosa's, and C&R, leaving GCI as the sole non-settling defendant. GCI's counsel preserved its objection that any duty GCI may have had was contractual in nature, as opposed to a duty arising from tort, and that it was precluded from having a duty because of the waiver of subrogation. GCI further noted that it was precluded from

10

a direct negligence action because of the VSA. At this point, GCI moved for judgment which was denied. The court stated the following:

> I am persuaded that [GCI] had, and the jury could find, an independent tort duty to Upper Rock arising out of, among other things, Section 324(a), the Restatement (Second) of Torts . . . It is obvious to me that you had four mushroom heaters with no training, no supervision, used against their protocols, against the instruction manual, it [is] an explosion waiting to happen, and the fact that nobody was hurt is a great thing, but it doesn't take [GCI] off the hook.

Bill Stewart, GRSI's Director of Construction, testified that GCI hired Red Coats to provide security and fire watch services on the site after GCI had to fire its previous vendor. Stewart testified that GCI was a subsidiary of GRSI and testified as to the corporate structure of GRSI. When questioned about whether GCI had a written policy regarding fire watch, Stewart said "I don't believe so." Lastly, Stewart testified that it was Hauska's responsibility to review the owner's manual for the mushroom heaters to determine how to safely operate the heaters. On cross-examination, Stewart testified that Oscar Ancheta, GCI's Assistant for the Project, Mario Branco, the Project superintendent, and Hauska handled fire watch. Stewart also noted that he was not aware of any training programs that GCI had regarding the use of temporary heating equipment, and that it was Ancheta's responsibility to walk the job site to make sure no hazardous conditions were present.

On June 6, 2017, the circuit court heard testimony from Branco, Jorgen Punda, GRSI's Regional Vice President of Investments,[6] and Donald Greene. Branco testified

---

[6] Punda testified that GRSI employed Gables Associates.

11

that all GCI employees were aware that the mushroom heaters were not to be used in a confined space, that the heaters were to be turned off every night before everyone left the construction site, and that these instructions would have been communicated to the foremen of the subcontractors. Branco testified that he did not see the mushroom heaters in the hallway, and that it would have been a violation of GCI's policy if the heaters remained operational after hours. Greene testified that "fire watch" is "a security patrol to identify potential fire hazards which could be dangerous to property and persons."

After the circuit court heard testimony and dismissed the jury, Retana moved for judgment against GCI.[7] Retana argued that the contract between GCI and Upper Rock contained a waiver of subrogation, arguing that it was in privity with GCI as a sub subcontractor. Next, Retana argued that GCI had not met its burden in proving a duty on behalf of Retana to turn the mushroom heaters off at the end of the day because the contract does not explicitly mention heaters, thus there is no duty. Retana pointed to the testimony of Stewart, who testified that GCI oversaw the heaters and was in charge of distributing manuals to subcontractors and sub-subcontractors. Retana also noted the testimony of Retana employee, Julio Retana, who testified that he never received instructions or direction related to the mushroom heaters. Lastly, Retana pointed to the testimony of Hauska, who testified that he "had no idea" who operated the heaters.

In summary, Retana claimed that there was no evidence that either Retana or Rosa's had a duty to turn the heaters off at the end of the day. According to Retana, the

___

[7] Retana and Rosa's Motions for Judgment occurred the day after Retana, Rosa's, and C&R each entered into confidential settlement agreements with Red Coats.

12

only reasonable explanation for the fire is that the heaters were turned on *after* both Retana and Rosa's had left for the day. Regarding the contribution claim, Retana's counsel argued that "[c]ontribution is the same argument with the added wrinkle of the waiver of subrogation which bars that claim."

Rosa's also moved for judgment, adopting Retana's arguments. Rosa's argued that there was no evidence showing who was the last to leave. What was known, according to Rosa's, was that GCI's protocol was to turn off the heaters at 6:00 p.m. Lastly, Rosa's argued that it was a borrowed employer of Retana.

GCI opposed Retana and Rosa's Motions for Judgment but agreed that the contract between GCI and Upper Rock contained a waiver of subrogation.[8] On the breach of contract claim, GCI conceded that there was nothing in the job safety manual or the job procedures manual stating that subcontractors were responsible for the heaters. As the circuit court questioned GCI on its defense, the following colloquy ensued:

> THE COURT: Where is there anywhere in any writing that's in evidence, anything at all, about whose job it was or what the requirements were, if you will, about the operation or maintenance of the mushroom heater.
>
> MS. RUSSELL: I think, as the Court is aware, the evidence that has been presented, both orally and in writing, there is no such memo. There is no such line that says, specifically, has specifically anything to do with the handling of the heaters. But there are provisions that talk about fire safety, combustibles, things like that, that we believe are applicable in this case.
>
> THE COURT: Well, you agree, I take it that your client owned the heaters, right?
>
> MS. RUSSELL: I do.

---

[8] GCI also filed cross claims against Retana, Rosa's, and C&R.

THE COURT: And do you also agree that if your client is the owner of a potentially dangerous device that before they allow somebody to use it, they have to give them some kind of training or safety instruction?

The circuit court granted both Retana's and Rosa's Motions for Judgment based on their counsel's arguments and because GCI presented "no evidence, at all, from which a reasonable jury could find a breach of contract, written or oral."

Next, the circuit court addressed C&R's motion for judgment. Counsel for C&R argued that there was an absence of evidence related to "who took the heater and put it into that position in that hallway[.]" The court granted C&R's motion because, again, there was no evidence suggesting a connection between C&R and the heaters.

Lastly, Red Coats moved for judgment against GCI for the remaining issue on its contribution claim – causation. Red Coats argued that the circuit court's grant of Red Coats' motion for partial summary judgment established that GCI breached its duty by putting the mushroom heaters in the hallway. The court chose to send the issue of causation to the jury.

*Jury Notes*

During its deliberation, the jury sent five notes to the court:

1. Does the waiver of subrogation in the vendor services agreement only apply to insurance coverage/claims, that is specifically, $10 million? ([Red Coats'] insurance payout) [?]

2. Is [GCI] a subsidiary/affiliate of [GRSI]?

3. How many pages are included in the contract between [Red Coats] and Gables (RC Exhibits 4 and 5)?

14

4. Is [the VSA] the only agreement/contract between [Red Coats] and [GCI] (Exhibits -RC – 4 and 5)?

5. How do we decide Question 3:
    a. Can we base the amount on assignment of blame or
    b. Does it need to be a percentage of the full settlement ($14 million) or only the insurance payout ($10 million) or the [Red Coats] contribution ($4 million)?

Pertinent is the circuit court's supplement to its previous instructions on the waiver of subrogation issue as follows:

> [GCI] contends that [Red Coats] and Ms. Shelton may not recover for any monies that they paid to Upper Rock against it by reason of a waiver of subrogation. [GCI] contends that there is a contract to that effect and that this contract bars any contribution claim. [Red Coats] and Ms. Shelton disagree. They contend that the parties did not contract to waive subrogation, either in whole or in part. That is, either for any money paid on their behalf to Upper Rock by an insurance carrier or any money they paid directly to Upper Rock.

> I remind you that a waiver of subrogation is (1) an affirmative defense on which (2) [GCI] bears the burden of proof by (3) a preponderance of the evidence.

> The party with the burden of proof must prove that something is more likely so than not so. If you believe that the evidence on a question of fact that you must decide is evenly balanced, then your finding on that issue must be against the party who has the burden of proving it.

By way of special verdict sheet and in response to the question "[w]as the fire that occurred on the evening of March 31-April 1, 2014, a direct result and a foreseeable consequence of [GCI's] negligence," the jury responded "yes." In response to the question "[i]s [Red Coats] precluded from recovering for contribution against [GCI] based upon a contractual waiver of subrogation, in whole or in part," the jury answered "no."

15

Following the jury's verdict, the circuit court entered the following notices of judgment:

. . .

6. A partial verdict in favor of [Red Coats] against [GCI] as to negligence.

7. A verdict in favor of [Red Coats] against [GCI], as to Red Coats's preclusion from recovering for partial or total contribution against [GCI] based upon a contractual waiver of subrogation.

8. A judgment against [GCI] in the amount of seven million dollars ($7,000,000.00).

Unhappy with the outcome of the trial, GCI timely filed an appeal on July 3, 2017. Additional facts will be included as necessary below.

## DISCUSSION

## I.

### *Preservation*

At the outset, Red Coats asserts that GCI did not specify the ruling it appeals related to its joint tortfeasor status. Red Coats further argues that GCI is precluded from appellate review because it only raised the issue of joint tortfeasor status in a pre-trial judgment motion and by moving for judgment after Red Coats closed its case-in-chief.

The record reflects that GCI moved to appeal the circuit court's judgment against it for a one half *pro rata* share of Red Coats' settlement with Upper Rock. This judgment was based upon the jury finding that Red Coats was not precluded, either in whole or in part, from recovering contribution from GCI based on a waiver of subrogation. Thus, to properly preserve this claim for appellate review, GCI would have had to preserve in the

16

record its objections to whether or not Red Coats was precluded by the waiver of subrogation in the Prime Contract, which it did. In fact, GCI claimed several times in pleadings and at trial that it was not a joint tortfeasor. *See Collins/Snoops Associates, Inc. v. CJF, LLC*, 190 Md. App. 146, 165-66, *cert. denied*, 414 Md. 331 (2010). Contrary to Red Coats' assertions, this claim continued after the court ruled in partial summary judgment that GCI breached its duty. Therefore, we hold that this issue was preserved.

*History of UCATA in Maryland*

At common law and before the enactment of the UCATA in 1941, "a statutory right of contribution among joint tortfeasors . . . did not exist[.]" *Central GMC, Inc. v. Helms*, 303 Md. 266, 276 (1985). As early as the 1700s, courts in England did not allow a joint tortfeasor to seek contribution from additional liable parties. *Montgomery County v. Valk Mfg. Co.*, 317 Md. 185, 189 (1989) (citing *Merryweather v. Nixan*, 8 Term. Rep. 186, 101 Eng. Rep. 1337 (1799)). Sister courts in the United States, too, barred contribution in cases of willful misconduct. *Valk*, 317 Md. at 189. While neither of these early courts addressed contribution in cases of negligence, American courts eventually extended bars to contribution in that area. *Id.* This change was widely criticized:

> There is obvious lack of sense and justice in a rule which permits the entire burden of a loss, for which two defendants were equally, unintentionally responsible, to be shouldered onto one alone, according to the accident of a successful levy of execution, the existence of liability insurance, the plaintiff's whim or spite, or the plaintiff's collusion with the other wrongdoer, while the latter goes scot free.

*Valk*, 317 Md. at 189 (citations omitted).

17

Even if two or more parties were liable for an injured person's harm, only one party would bear the brunt of financial liability. Even if that burdened party knew an additional party was just as responsible for the harm, it could not seek contribution.

In simpler terms, this meant that if an injured party, A, sued a tortfeasor, B, B could never recover money from C, even if C was also responsible for A's injury. This gave injured parties the power to cherry-pick which tortfeasor it would sue, forcing the weight of financial responsibility on one party alone. *Valk*, 317 Md. at 189-90. Due to this conundrum, tortfeasors were encouraged to *settle for less* than the full amount of damages because of the "fear of each that unless he settles he may have to bear alone the full weight of the verdict." Fleming James, Jr., *Contribution Among Joint Tortfeasors: A Pragmatic Criticism*, 54 Harv. L.Rev. 1156, 1161 (1941).

The UCATA was promulgated in 1939 by the American Law Institute and the National Conference of Commissioners on Uniform Laws to address this inherent unfairness. Prefatory Note, *Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Forty-Ninth Annual Conference* 240-41 (1939). The General Assembly adopted the UCATA, based on this national model in 1941. *Id.* at 241. After its adoption, the Court of Appeals stated: "The primary purpose of the [UCATA] was to create a right of contribution among joint tortfeasors which did not exist at common law . . . and to establish a procedure whereby that right might be

18

made effective in practice." *Baltimore Transit Co. v. State ex rel. Schriefer*, 183 Md. 674, 679 (1944).[9]

Under UCATA, one liable party no longer bears the burden of damages alone as that party now has a statutory right to seek contribution from other, liable parties. In place of the "release of one releases all" standard at common law, the UCATA provides that a release of one joint tortfeasor does not relieve the liability of other joint tortfeasors, but reduces the judgment against them by either the consideration paid for the release or an amount or proportion provided in the release, whichever is greater.

This statutory right, however, has its limitations. Per the UCATA, one tortfeasor can only sue another if "there is a common liability to an injured person in tort." *Valk*, 317 Md. at 192. A distinction exists, though, between common liability and joint negligence. The Minnesota Supreme Court has noted, "[c]ontribution rests on common liability, not on joint negligence or joint tort. Common liability exists when two or more actors are liable to an injured party for the same damages, even though their liability may rest on different grounds." *Pautz v. Cal-Ros, Inc.*, 340 N.W.2d 338, 339 (Minn. 1983) (citation omitted).

*GCI is a Joint Tortfeasor under the UCATA*

---

[9] While the uniform law was subsequently revised, Maryland retained most of the version that had been adopted and only abrogated the third party practice provision originally in the UCATA. *See Valk*, 317 Md. at 190-91 (citing 1957 Md. Laws. Ch. 399 (repealing third party practice provision); and 1947 Md. Laws Ch. 717 (modifying third party practice provision)).

For the purposes of this limited discussion of GCI's joint tortfeasor status, we have put aside the effect of the waiver of subrogation. That conversation will follow. GCI argues that the waiver of subrogation in the Prime Contract precludes Red Coats from recovery under UCATA. Primarily, GCI advances that because Red Coats entered into a settlement with Upper Rock, it can only receive contribution from a person with whom it is "jointly or severally liable in tort[.]" *See* Md. Code (1973, 2013 Repl. Vol.), Courts & Judicial Proceedings Article ("CJP") § 3-1401(c). GCI argues that it is not a party that was "jointly or severally liable in tort" for the harm to Upper Rock due to the waiver of subrogation in the Prime Contract.

Red Coats responds that GCI is a joint tortfeasor under UCATA because the jury "adjudicated GCI to be a joint tortfeasor" by rendering a verdict that GCI's negligence was a proximate cause of the fire that destroyed Building G. In responding to GCI's claim that it is barred by the waiver of subrogation in the Prime Contract, Red Coats responds that neither it nor Shelton were a party to the contract. Further, Red Coats argues that if we hold that the waiver of subrogation serves as a contractual shield to UCATA, we will upset the core of UCATA. That is, the "inherent injustice" of a liable party escaping scot-free, even in cases of substantial bodily harm or death.

The UCATA defines joint tortfeasors as: "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." CJP § 3-1401(c). A party can be defined as a joint tortfeasor through its own admission or by judicial determination. An injured

20

person is defined as "any person having a claim in tort for injury to person or property." CJP § 3-1401(b).

Maryland precedent provides that a party may qualify as a joint tortfeasor upon adjudication as liable or upon conceding its own liability. *See Martinez v. Lopez*, 300 Md. 91, 94-95 (1984) (establishing that a party in the case became a joint tortfeasor when it signed a release reading "for the purposes of the aforegoing Release" [the parties] are to be consider joint tortfeasors within the meaning of the [Md. Act]"). However, UCATA "does not specify the test of liability." *Swigert v. Welk*, 213 Md. 613, 619 (1957). Without an admission or adjudication of liability, a party who enters into a release is deemed a volunteer, not a joint tortfeasor. *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 529-30 (2011).

On its special verdict sheet and in response to the question "[w]as the fire that occurred on the evening of March 31-April 1, 2014, a direct result and a foreseeable consequence of GCI's negligence?" the jury responded "yes." In addition, the circuit court entered summary judgment on the issue of GCI's negligence related to the heaters, which testimony adduced was the cause of the fire to Building G. Therefore, for the purposes of this appeal, both the court and the jury determined that GCI was a joint tortfeasor with Red Coats for the purposes of UCATA, and thus, we now turn to whether Red Coats can seek contribution from GCI.

*The Waiver of Subrogation does not bar recovery under UCATA*

GCI presents an issue of first impression for our review: whether a waiver of subrogation can serve as a contractual shield that both prevents direct liability to an

21

injured party and *bars any third-party contribution claims under UCATA*. As we will discuss below, the waiver of subrogation, in this case, does not waive GCI's direct liability to Upper Rock, and therefore, cannot serve as a complete bar to recovery pursuant to UCATA.[10]

As we will discuss, Maryland courts have recognized bars to contribution under UCATA, including family immunity, spousal immunity, and contributory negligence. GCI argues that the waiver of subrogation in the Prime Contract is like these other bars to recovery and argues that the Court of Appeals' decision in *Valk*, 317 Md. at 199-200, is dispositive.

Red Coats counters that *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671 (2000), controls. We agree with Red Coats and hold that the waiver of subrogation by contract in the Prime Contract cannot serve as a bar to contribution under UCATA. The waiver of subrogation is only germane to the contract and does not spring from the relationship of the parties or the tortious conduct.

####    i.    Contributory Negligence as a bar to contribution under the UCATA

The Court of Appeals first addressed the issue of joint tortfeasor contribution in cases of contributory negligence in *Valk*, 317 Md. 186-87. In *Valk*, the Court addressed the issue of whether a manufacturer could recover from the plow's user some of the

---

[10] We need not, and do not, decide here whether a complete contractual waiver of GCI's direct liability to Upper Rock would have served as a complete bar to recovery pursuant to UCATA.

money it paid to the plaintiffs, even if the plaintiffs could not have held the plow's user liable due to contributory negligence. *Id.* at 186.

Prior to 1982, Montgomery County purchased a snow plow made by the Valk Manufacturing Company and installed it on one of its trucks. *Id.* at 187. In December 1982, "the County drove the truck with the plow device, but without the plow blade." *Id.* When it was without its blade, the steel plow arm became a deadly device, described as a "battering ram." *Id.*

Dr. Rangaswamy, the decedent, was driving in Montgomery County when his car collided with the County's plow truck. *Valk*, 317 Md. at 187. In fact, Dr. Rangaswamy had pulled onto the road directly in front of the oncoming truck. *Id.* Due to the collision, the steel plow arm of the snow plow penetrated the driver's side window. *Id.* The doctor "suffered puncture wounds to the left side of his skull and chest injuries" and died. *Id.*

Dr. Rangaswamy's wife and son brought a wrongful death action against the County and a strict liability claim against Valk. *Id.* Valk, in turn, filed a negligence cross-claim against the County for contribution. *Id.* The circuit court found that Dr. Rangaswamy was contributorily negligent in pulling his car into the intersection and dismissed the wife and son's claim against the County, as well as Valk's cross-claim, which Valk would later appeal. *Valk*, 317 Md. at 187-88. Therefore, the only thing left to decide was the strict liability claim against Valk. *Id.* at 188. A jury found that Valk was liable for creating a "defective and unreasonably dangerous snow plow design." *Id.* at 188. Valk filed an appeal challenging the dismissal of Valk's cross-claim against the County for contribution.

23

On appeal the Court of Appeals considered the meaning of the terms "liable in tort" and "common liability" in the UCATA. Specifically, it addressed the terms in the context of interspousal immunity, worker's compensation, and contributory negligence. *Id.* at 191-92.

The Court first addressed *Ennis v. Donovan*, 222 Md. 536 (1960), a case where a plaintiff sued Ennis for negligent driving. In response, "Ennis sued the plaintiff's spouse who had been driving at the time of the accident." *Valk*, 317 Md. at 192. The Court found that UCATA was "only applicable to a situation where there is a common liability to an injured person in tort." *Ennis*, 222 Md. at 540. Next, the Court discussed *Schriefer*, 183 Md. at 679. There, the Court "barred contribution where a third party defendant was an employer who had achieved immunity through compliance with the Workmen's Compensation Act." *Valk*, 317 Md. at 192. The *Valk* Court stated that in reaching its conclusion in *Schriefer*, "relied on the Commissioners' notes to the 1939 version of the UCATA." *Id.* at 192-93. Those notes, relevant here, stated:

> The common obligation contemplated by this Act is the common liability of the tortfeasors to suffer adverse judgment at the instance of the injured person whether or not the injured person elects to impose it and 2) the Act permits contribution among all tortfeasors whom the injured party could hold liable jointly and severally for the same damage or injury . . . .

*Id.* at 193 (quoting *Schriefer*, 183 Md. at 680).

The *Valk* Court then noted, "[t]hese comments clearly reflect the Act's assumption that contribution from a third party defendant is predicated on his or her direct liability to the plaintiff." *Valk*, 317 Md. at 193. *Schriefer* now stands for the proposition that, "there [is] no right of contribution where the injured person has no right of action against the

24

third party defendant." *Id.* (quoting *Stem v. Nello L. Teer Co.*, 213 Md. 132, 142 (1957)). Aptly, the Court noted that immunities are "on the wane," and that courts are "reluctant to bar contribution among unintentional wrongdoers." *Valk*, 317 Md. at 196. Next, the Court turned to the issue of contributory negligence as a bar to recovery stating, "[l]ike intrafamily immunity, contributory negligence bars recovery against wrongdoers." *Id.* at 197. The Court looked to cases that address contributory negligence and recovery and found that most courts bar contribution against a third party defendant who asserts the defense of contributory negligence. *Id.* at 198. The Court noted that this result seemingly flowed from the "natural consequences of the debate that has raged over family immunities." *Id.* at 198.

The Court held that the County was not liable to the plaintiffs because contributory negligence rendered the County not "legally responsible to the plaintiff for his or her injuries." *Id*. at 200. Due to the lack of liability to the plaintiff, therefore, the Court reasoned that the County was not a joint tortfeasor under the UCATA and held that the circuit court properly dismissed Valk's cross-claim for contribution against the County. *Id.*

ii.     *Immunities as a bar to contribution under the UCATA*

The next case of considerable interest is *Parler & Wobber*, 359 Md. at 676-77, which presented an issue of first impression: whether a lawyer "being sued by a former client for malpractice, could obtain contribution or indemnification from a successor lawyer stemming from the successor's malpractice or negligent misrepresentation of the same client in the same matter." *Id*. at 676-77. On appeal, the law firm Miles &

25

Stockbridge argued that it had a statutory right to implead Parler for contribution under the UCATA because UCATA serves to "[ensure] that the cost of injuries is distributed fairly among joint-tortfeasors[.]" *Id.* at 682. Parler, conversely, argued that an impleader action under UCATA would breach the attorney-client relationship by "invading the successor attorney's duty of confidentiality owed to the client and the attorney-client privilege." *Id.* at 683.

The Court looked to the decisions of sister states that, in a reluctance to undermine the UCATA, had "refuse[d] to recognize a direct action in negligence or third party action in contribution . . . for fear of the adverse impact such an action would have on the attorney-client relationship." *Id.* at 694.

The Court held that "[p]rohibiting a joint tortfeasor action in this case would open an undesirable loophole in *Thomas v. Bethea*, 351 Md. 531 (1998),[11] and circumvent the purpose of the UCATA." *Parler*, 359 Md. at 704. The Court noted that the central premise of *Thomas* and the UCATA is that "a party should be held accountable for damages caused by his or her negligence." *Id.* The Court also indicated "[w]e think the better public policy approach is for the parties to lay their cards on the table for the fact-finder to determine the facts and allocate the loss to the proper parties, rather than granting successor counsel a shield of immunity for its alleged wrongful acts." *Id.* at 705.

---

[11] "A central premise of *Thomas* and UCATA is that a party should be held accountable for damages caused by his or her negligence. Successor counsel could escape from this accountability by forcing former counsel to shoulder the burden of loss to the client in situations where both attorneys may have brought about the client's injury. The unfair and unjust outcome for former counsel would be reminiscent of the pre-UCATA era." *Parler & Wobber*, 359 Md. at 704-05.

26

### iii. *The Waiver of Subrogation in the Prime Contract*

The waiver of subrogation in the Prime Contract is different in kind from both immunity and contributory negligence, which are bars to recovery under UCATA. Immunity and contributory negligence arise from the wrongdoing itself. *See Valk*, 317 Md. at 197 n.16. By contrast, the waiver of subrogation here stems from a contractual agreement formed long before the harm occurred.

In *Valk*, Dr. Rangaswamy's contributory negligence barred his family's recovery. That contributory negligence, attributed to the decedent, severed the direct liability to Dr. Rangaswamy's survivors that was essential to a contribution claim under UCATA. *Id.* at 188. Similarly, in *Parler*, the issue of impleader and attorney-client privilege was connected to the actions of an earlier attorney. In spousal immunity and intra-family immunity cases, our courts have barred contribution precisely because the family relationship severed the "common liability" to a plaintiff. In *Valk*, however, the Court of Appeals noted both a reluctance to carve out exceptions to UCATA and that immunities were "on the wane." *Valk*, 317 Md. at 196.

Waivers of subrogation, treated as contracts, are different from these historical bars to contribution. A contract is an agreement that creates an obligation or a promise or set of promises for breach of which the law provides a remedy, or the performance of which the law recognizes as a duty. *See Post v. Gillespie*, 219 Md. 378 (1959); *County Com'rs for Carroll County v. Forty West Builders, Inc*., 178 Md. App. 328 (2008); *Goldstein v. Miles*, 159 Md. App. 403 (2004). A "contract is binding only upon the parties to the contract and their privies." *Homeseekers' Realty Co. v. Silent*

27

*Automatic Sales Corp.*, 163 Md. 541, 545 (1933).  Bars to contribution such as contributory negligence and family immunity are enforceable against the world at large.  By contrast, GCI's and Upper Rock's waiver of subrogation is only enforceable as to the parties to the contract and does not apply to Red Coats.  As such, we hold that a contractual waiver of subrogation does not extinguish the right to contribution of a joint tortfeasor who has not bound itself to that provision of the contract.

If we hold differently, contracting parties would be able to return to the pre-UCATA days.  This could create a chilling effect on business relationships if the new normal is to insulate business entities from liability and contribution claims.  It is well-settled that a "contractual agreement between a plaintiff and a co-defendant cannot serve to define the liability of another co-defendant not a party to the agreement."  *Rivera v. Prince George's County Health Dep't*, 102 Md. App. 456, 478 (1994).  That determination is not ours to make, and we suspect that had the legislature intended to provide that contractual shield, it would have done so.  *See Valk*, 317 Md. at 199.  We will not do so here today.[12]

*The Settlement Agreement and Release between Upper Rock and Red Coats Limits Red Coats' recovery from GCI*

On June 22, 2016, Upper Rock and Travelers Insurance as subrogee of Upper Rock, and Red Coats entered into a "Settlement Agreement and Release" for a settlement

---

[12] We also briefly note that under the Prime Contract, Upper Rock did not relieve GCI from *all* tort liability.  It simply waives the right of subrogation by an insurer.  Waiver of subrogation clauses are intended to relieve contractors from insuring for the same loss.  Accordingly, GCI could be liable to an owner in tort for a loss even without the subrogation clause.

28

payment of $14 million dollars.[13]  The Settlement Agreement and Release named Red

Coats and Shelton, collectively, as the defendants.  The Agreement provided in relevant

part:

7. This AGREEMENT is intended to, among other things, fully extinguish
   and discharge all liability and common liability, if any, to UPPER ROCK
   of all who are, or might be claimed by DEFENDANTS to be joint
   tortfeasors, including, but, not limited to, [GCI], RETANA, ROSA'S, and
   C&R, and to preserve DEFENDANTS' right of contribution against all
   who are, or might be claimed by the DEFENDANTS to be joint tortfeasors,
   including, but not limited to, [GCI], RETANA, ROSA'S, and C&R, under
   Section 3-1402 of the Courts and Judicial Proceedings Article that relates in
   any way to the OCCURRENCE.

8. Nothing in this AGREEMENT is intended to, or shall be construed to
   release, impair or affect any claim, including any claim for contribution
   and/or indemnification, by either of the DEFENDANTS against any third
   party, including, but, not limited to, [GCI], RETANA, ROSA'S, and C&R.

9. Notwithstanding the above, UPPER ROCK does not contend, nor has it
   ever contended, that GABLES was a joint tortfeasor with liability arising
   out of the OCCURRENCE.

   The section titled "Release" stated:

   In consideration of the payment of the [$12,000,000.00] portion of the
   SETTLEMENT PAYMENT set forth in Section C.1 and delivery of the
   fully executed NOTE, UPPER ROCK for itself and its members, insurers,
   successors, and assigns, hereby fully and completely release, extinguish,
   and forever discharge the DEFENDANTS and all other persons,
   partnerships, companies, corporations, firms and entities which are or might
   be claimed to be liable to UPPER ROCK, including, but, not limited to,
   [GCI], RETANA, ROSA'S, and C&R, and each such released person,
   partnership, company, corporation, firm and entity's respective past,
   present and future officers, directors, stockholders, attorneys, agents,

---

[13] The release agreement stipulated that Red Coats had "one year from the EFFECTIVE DATE of this AGREEMENT to pay TWO MILLION DOLLARS ($2,000,000[.00]) of the SETTLEMENT PAYMENT.  After payment of $2 million dollars, Red Coats would need to pay $12 million dollars of the remaining settlement payment, bringing the total paid to $14 million dollars.

servants, representatives, employees, subsidiaries, affiliates, partners, insurers, predecessors, successors and assigns, of and from any and all past, present or future liability, common liability, claims, demands, obligations, actions, causes of action, rights, damages, costs, expenses and compensation of any nature whatsoever, whether based on a tort, contract or other theory of recovery at law or in equity, and whether now known or unknown, and whether for compensatory or punitive damages or other form of relief, which UPPER ROCK now has, or which may hereafter accrue, or otherwise be related to, or in any way growing out of, or which are the subject of, the OCCURRENCE.

In the section titled "Agreement as to Joint Tortfeasors," Red Coats and Shelton conceded their joint tortfeasor status. That section also states that "[e]ach Joint Tortfeasors' liability for contribution will be limited to that Joint Tortfeasors' *pro-rata* share of the common liability." (Emphasis in original). Lastly, the Agreement indicates that it is intended to "fully extinguish and discharge all liability and common liability, if any, to UPPER ROCK, of all who are, or might be claimed by the DEFENDANTS to be joint tortfeasors," including GCI.

GCI, in error, argues that the waiver of subrogation in the Prime Contract limits the amount it must contribute to Red Coats. However, it is the release between Upper Rock and Red Coats which limits the amount GCI must pay.[14]

CJP § 3-1405. Effect of release on right of contribution provides:

A release by the injured person of one joint [tortfeasor] does not relieve the joint [tortfeasor] from liability to make contribution to another joint [tortfeasor] unless the release:

(1) Is given before the right of the other [tortfeasor] to secure a money judgment for contribution has accrued; and

---

[14] The contract between Upper Rock and Red Coats did not incorporate the Prime Contract.

30

(2) Provides for a reduction, to the extent of the pro rata share of the released [tortfeasor], of the injured person's damages recoverable against all other [tortfeasors].

In this release, Red Coats admitted its joint tortfeasor status and a jury adjudicated GCI a joint tortfeasor. *See Mercy Medical Center v. Julian*, 429 Md. 348, 369 (2012). *Jones v. Hurst*, 54 Md. App. 607, 610 (1983) is also pertinent to our discussion.

In *Jones*, appellant's vehicle was rear-ended by an automobile owned by the appellee. 54 Md. App. at 609. Jones, the appellant, sued the Hursts, appellees, for personal injuries arising from the accident. *Id.* Hurst, in response, contended that the accident was caused by brake failure. *Id.* Thus, Jones then filed a separate action against General Motors Corporation and Park Circle Motor Company. *Id.* Later, Jones settled her action with General Motors. The consideration was a "Joint Tortfeasor Release" that said Jones "'claimed the said General Motors Corporation to be legally liable' for the accident 'for which liability is hereby expressly denied.'" *Id.* The release expressly stated that "for the purpose of determining the amount of any judgments that may be recovered by me against any person, firm, or corporation, except General Motors . . . the said General Motors Corporation shall be considered as joint [tortfeasors] to the same extent and effect as if judgments had been rendered against them [sic] as joint [tortfeasors]. *Id.* at 611 (alterations added).

When the case came before the circuit court, the jury rendered a verdict against Hurst and in favor of Jones. *Id.* at 610. Hurst invoked the General Motors release and moved for a pro rata reduction of the judgment. *Id.* The circuit court granted the motion and reduced the amount of the judgment. *Id.* On appeal, Jones argued that the release

31

was like that in *Swigert*, 213 Md. 613 (1957).  In *Swigert*, a party's joint tortfeasor status had not been determined where the release only contained a denial of liability.  *Swigert*, 213 Md. at 619.  On that point, the court found that the General Motors release was distinguishable from *Swigert* because it contained both a denial *and* admission of liability.  *Jones*, 54 Md. App. at 611.  Accordingly, the Court found that UCATA applied to the case.  *Id.* at 613.  There was an admission of liability in the release in this case.

CJP § 3-1402 creates the right of contribution among joint tortfeasors and specifies when this right accrues.  It provides:

> (a)      *In general.* -- The right of contribution exists among joint [tortfeasors].
>
> (b)      *Discharge of liability or payment of share.* -- A joint [tortfeasor] is not entitled to a money judgment for contribution until the joint tortfeasor has by payment discharged the common liability or has paid more than a pro rata share of the common liability.
>
> (c)      *Effect of settlement.* -- A joint [tortfeasor] who enters in a settlement with the injured person is not entitled to recover contribution from another joint [tortfeasor] whose liability to the injured person is not extinguished by the settlement.

Only after a joint tortfeasor has paid more than his or her share of the common liability may another tortfeasor seek contribution pursuant to the UCATA.  "Pro rata anticipates equal shares that are determined by dividing the common liability by the number of joint tortfeasors."  *Julian*, 429 Md. at 357 (citations omitted).  In the instant case, Red Coats settled with Upper Rock for a total of $14 million, $4 million of which it paid out of pocket, which was more than its pro rata share of the common liability.  In addition, a close reading of the Release reflects that Upper Rock intended to "fully

32

extinguish and discharge all liability and common liability . . . to Upper Rock" by joint tortfeasors, including GCI. Therefore, the requirements of CJP § 3-1402 were met.

Pursuant to CJP § 3-1404, while a release of one joint [tortfeasor] does not discharge the other [tortfeasors] unless the release so provides, "it reduces the claim against the other [tortfeasor] in the amount of the consideration paid for the release or in any amount or proportion by which the release provides."

In the instant case, the Release provided that "DEFENDANTS shall pay, or cause to be paid, the sum total of [$14 million dollars]." Red Coats paid Upper Rock $14 million dollars in total, $4 million of which it paid out of pocket. The Release satisfies all the requirements of UCATA §§ 3-1401 and 3-1402 so as to give Red Coats the *right* to contribution. As we explain in the next section, the waiver of subrogation in the VSA reduces the *amount* Red Coats can recover from GCI to half of the amount it paid out of pocket, or $2 million. *See Julian*, 429 Md. at 357 (citations omitted) ("Pro rata anticipates equal shares that are determined by dividing the common liability by the number of joint tortfeasors."). On that basis, we hold that the jury erred in rendering damages of $7 million dollars.

## II.

In its special verdict sheet, the jury determined that Red Coats was not precluded from recovering for contribution against GCI based upon the contractual waiver of subrogation. GCI argues that the waiver of subrogation in the VSA reduces the amount it must contribute to Red Coats to $2 million dollars, half of the $4 million that Red Coats

paid out of pocket. Just as the settlement agreement and release between Upper Rock and Red Coats limits Red Coats' recovery from GCI[15], the VSA limits Red Coats recovery as well.

Red Coats first responds that GCI did not preserve this claim for our review. Next, Red Coats argues that the VSA does not contain a waiver of claim provision but, instead, contains a contractual requirement that certain types of insurance be purchased. Red Coats also argues that GCI did not include evidence with its summary judgment motion that a qualifying insurance policy had been purchased. Red Coats also states that "[i]f there was no insurance . . . then there can be no subrogation, and thus no waiver." Lastly, Red Coats argues that GCI did not prove all three elements of the VSA waiver at trial because it never addressed whether Red Coats purchased an insurance policy, let alone whether the policy complied with the VSA.

Essentially, GCI argues that as an affiliate of GRSI, it is an intended beneficiary of the VSA between GRSI and Red Coats. "The primary source for determining whether the parties intended a third party to have standing to enforce the contractual provisions is the language of the contract itself." *Volcjak v. Washington County Hosp. Ass'n*, 124 Md. App. 481, 509 (1999). In some cases, the contract may clearly express an intended third party beneficiary, *see Schlicht v. Wengert*, 178 Md. 629, 634 (1940) ("And it would be incorrect to say that any ground of valid inference must be disregarded. An inference which appears with sufficient clearness from any source should be accepted"), but the

---

[15] *See* CJP § 3-1405.

34

absence of a clear expression is not necessarily decisive, for "[i]f the meaning of the instrument is not clear from its terms," *Belleview Constr. Co. v. Rugby Hall Community Ass'n*, 321 Md. 152, 157 (1990) (emphasis added), "a party seeking enforcement [may] show an unexpressed intention by inference from . . . the circumstances" surrounding the execution of the contract. *Schlicht*, 178 Md. at 634.

As discussed *infra*, Maryland follows the law of objective contract interpretation. *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 166 (2003). Under the objective test of contract interpretation, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." *Sy-Lene*, 376 Md. at 166 (internal citations omitted). "A contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution; rather, if a written contract is susceptible of a clear, unambiguous and definite understanding . . . its construction is for the court to determine." *Id.* (internal citations omitted). When a contract is unambiguous, we look to the contract's plain and ordinary meaning and consider the context in which it is used. *See id.* at 166-67.

Section B of the VSA provided:

Vendors providing any type of good and/or service that require their company to send a representative to the apartment community must have a current certificate of insurance on file with Compliance Depot for general liability, auto liability, excess liability if applicable, and workers' compensation. All coverage shall be primary and non-contributory. The following parties must be added to the general liability policy as an additional insured as their interests may appear in regard

35

to work performed by Vendor: "GABLES RESIDENTIAL SERVICES, INC, ITS PARENT, MEMBERS, SUBSIDIARIES AND AFFILIATED COMPANIES; AND THEIR PARTNERS, JOINT VENTURERS; AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES." A waiver of subrogation shall apply in favor of the aforementioned parties '**on all policies**' as permitted by law.

(Emphasis added).

Section 15.6.16 provided that "Contractor is an affiliate of both Developer and Developer's affiliate." The VSA defined the Contractor as being "Gables Residential Services, Inc." in Section 15.6.14.[16] Black's Law Dictionary (10th ed. 2014) defines an affiliate as:

1.  A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation.

2.  *Securities.* Someone who controls, is controlled by, or is under common control with an issuer of a security.

GCI presented the testimony of Bill Stewart, who testified as to GRSI's corporate structure and GCI's subsidiary status. While the jury questioned whether GCI was an affiliate of GRSI, it only had the testimony of Bill Stewart to weigh. In reading the language of the contract, namely, "[GRSI] its parent, members, subsidiaries, and affiliated companies," we find it fairly obvious that GCI is, in fact, an affiliate of GRSI.

As an affiliate, GCI is only liable for what is not covered by the waiver of subrogation which is the amount not covered on all policies. Therefore, GCI is only

---

[16] We note that Upper Rock signed the Prime Contract as "Owner" and GCI, not GRSI, signed as "Contractor."

36

liable for $2 million, which is half of its pro rata share of the $4 million Red Coats paid out-of-pocket.

## III.

There are additional issues raised on appeal that we shall discuss. At the April 1, 2016 motions hearing, the circuit court heard testimony on GCI's motion for summary judgment which it later denied. The court found that GCI had not met its burden of proving that it did not violate a standard of care, noting the testimony of its withdrawn standard of care expert, Richard Kreimborg. Later at trial, the court would declare that Mr. Kreimborg's testimony was an "admission of a party opponent" that GCI could be stamped with.[17]

GCI argues that the circuit court erred in granting partial summary judgment because there were many material facts in dispute, namely whether GCI violated the National Fire Protection Association ("NFPA") 241[18] and Occupational Safety and Health Administration ("OSHA") Subpart F § 1926.154.[19] Another material fact in

---

[17] It is not necessary for this Court to address the issue as to whether Mr. Kreimborg is a party opponent. Black's Law Dictionary defines a party as "[o]ne by or against whom a lawsuit is brought; anyone who both is directly interested in a lawsuit and has a right to control the proceedings, make a defense, or appeal from an adverse judgment[.]" *See* Md. Rule 5-803(a)(1) provides that, "A statement that is offered against a party and is . . . [t]he party's own statement, in either an individual or representative capacity" is "not excluded by the hearsay rule." *See also Briggeman v. Albert*, 322 Md. 133, 137 (1991).

[18] NFPA 241 provides measures for preventing or minimizing fire damage to structures, including those in underground locations, during construction, alteration, or demolition. NFPA 241 § 5.2.3.

[19] OSHA Subpart F § 1926.154 – Temporary heating devices.

dispute, according to GCI, was whether Kreimborg's testimony on GCI's standard of care created a rebuttable presumption that GCI breached the standard of care.

Red Coats responds that the circuit court did not err in granting partial summary judgment because "the vast majority of the facts GCI now asserts should have created a dispute of fact at summary judgment [but] were not included with GCI's opposition to [Red Coats'] summary judgment motions." Red Coats argues that these facts were presented to the circuit court in GCI's motion for reconsideration from which it did not appeal. Red Coats next argues that the circuit court determined that GCI breached the

---

(a) Ventilation.
   (1) Fresh air shall be supplied in sufficient quantities to maintain the health and safety of workmen. Where natural means of fresh air supply is inadequate, mechanical ventilation shall be provided.
   (2) When heaters are used in confined spaces, special care shall be taken to provide sufficient ventilation in order to ensure proper combustion, maintain the health and safety of workmen, and limit temperature rise in the area.

(b) Clearance and mounting.
   (1) Temporary heating devices shall be installed to provide clearance to combustible material not less than the amount shown in Table F-4.
   (2) Temporary heating devices, which are listed for installation with lesser clearances than specified in Table F-4, may be installed in accordance with their approval.

| | Minimum clearance, (inches) | | |
|---|---|---|---|
| Heating Appliances | Sides | Rear | Chimney Connector |
| Room heater, circulating type…….. | 12 | 12 | 18 |
| Room heater, radiant type………….... | 36 | 36 | 18 |

applicable standard of care which it based upon GCI's own admissions. Lastly, Red Coats argues that GCI failed to present any evidence sufficient to create a dispute of material fact related to its standard of care.

A trial court shall grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the [moving] party . . . is entitled to judgment as a matter of law." Md. Rule 2-501(f). We review an order granting summary judgment *de novo*. *Walk v. Hartford Cas. Ins. Com.*, 382 Md. 1, 14 (2004). In our review, we construe the record, including all inferences, in the light most favorable to the non-moving party. *Bednar v. Provident Bank of Md., Inc.*, 402 Md. 532, 542 (2007).

In determining whether a genuine dispute of material fact exists, we must examine the pleadings, admissions, and affidavits to resolve all inferences drawn therefrom against the moving party. We note that "there must be evidence upon which the jury could reasonably find for the plaintiff." *Campbell v. Lake Hallowell Homeowners Ass'n*, 157 Md. App. 504, 518 (2004) (citations and quotations omitted). If we find no material facts in dispute, we decide whether the circuit court properly entered partial summary judgment as a matter of law. *Catalyst Health Solutions, Inc. v. Magill*, 414 Md. 457, 471 (2010). In making this determination, we are bound by the record "and decide the same issues as the circuit court." *Id.* "[I]ndeed, an appellate court ordinarily may uphold the grant of a summary judgment only on the grounds relied on by the [circuit] court." *Campbell*, 157 Md. App. at 518-19 (internal quotations and citation omitted).

39

Kreimborg, GCI's withdrawn standard of care expert, was deposed on March 7, 2017, and the following colloquy ensued:

Q: So [GCI] in this case, whichever entity we're referring to, was required to follow the Montgomery County code in Building G, correct?

A: Yes, sir.

Q: Is that part of the standard of care?

A: Yes, sir.

Q: And [GCI] was required to follow OSHA as well, correct?

A: Yes, sir.

          \*          \*          \*

Q: Is violation of - are violations of OSHA by [GCI] violations of the standard of care?

MS. RUSSELL: Objection.

A: I can't answer that question.

Q: You don't know whether complying with federal law is a requirement of the standard of care?

MS. RUSSELL: Objection.

A: Is OSHA federal law?

Q: Yes.

A: Then I would say it's part of the standard of care.

Q: Is complying with the Montgomery County code part of the standard of care?

MS. RUSSELL: Objection.

A: Yes, sir.

Q: So if [GCI] violated the Montgomery County code, they violated the standard of care for this case, right?

MS. RUSSELL: Objection.

A: I'm presuming that in general you're right.

Q: And if [GCI] violated OSHA in connection with this case, they violated the standard of care, correct?

MS. RUSSELL: Objection

A: I would say you're right, without knowing a specific example that you're thinking about.

In examining Kreimborg's deposition testimony, the circuit court found that his testimony was an admission of a party opponent that GCI could be "tattooed" with.

Other than Kreimborg's testimony, GCI offered no additional evidence to suggest that it did not breach its standard of care in terms of its compliance with OSHA. In his deposition testimony, Kreimborg was repeatedly asked to opine on questions he could not address, such as whether GCI complied with NFPA 241.

Kreimborg's testimony corroborated GCI's role in breaching the standard of care. In its brief, GCI makes mention of the fact that the hallway was too narrow to accommodate the mushroom heaters, which Kreimborg corroborated. Kreimborg testified that the mushroom heaters were not installed in accordance with manufacturer instructions, that someone at GCI should have been familiar with NFPA 241, and that whomever put the heaters in the fourth floor hallway of Building G violated the standard of care. In addition, Kreimborg's testimony proved fatal to GCI when he made this additional statement in the following colloquy:

41

Q: Have you reviewed [GCI's] fire protection plan?

A: No, sir.

Q: Was [GCI] required to have a fire protection plan?

A: I expect that [GCI] does have a fire protection plan.

Q: Have you reviewed it?

A: No, sir.

Q: How can you express any opinion as to whether [GCI] met this standard of care in this case if you haven't looked at their fire protection plan?

A: You didn't ask me - what you asked me was can [GCI] track the location of each burner.

Q: No, sir.

A: Hour by hour.

Q: I move to strike. What I just asked you was how can you express an opinion that [GCI] met the standard of care in this case if you haven't reviewed their fire protection plan?

A: I can't, I guess. I have to review that as there are other things that, like you said at the beginning, there are other things that may change my opinion going forward.

Q: So you agree with me that sitting here today having not reviewed [GCI's] fire protection plan, you can't express an opinion that they met the standard of care?

A: I can say that my opinion right now today is they met the standard of care.

While it is true, as GCI suggests, that Kreimborg did not explicitly say GCI breached the standard of care, GCI did not put on any other expert testimony bridging the gaps in Kreimborg's testimony, especially related to substantive factual issues that he

42

could not effectively testify to, such as GCI's compliance with OSHA Subpart F and NFPA 241.

GCI also contends that the deposition testimony of Hauska and Ancheta create a genuine dispute of material fact as to the standard of care. Ancheta was deposed on July 7, 2015. Ancheta testified that contractors decided where to place the mushroom heaters. He also testified that he provided Red Coats' guards with instructions about the mushroom heaters, but that he did not provide these instructions to all of the Red Coats' guards.

On July 8, 2015, Hauska testified that the subcontractors decided the placement of the mushroom heaters. When asked about whether the policy of making sure that the mushroom heaters were turned off at the end of the day was in writing, Hauska responded "I do not believe that there's a written policy." When asked about how he knew whether any of that information was relayed to the subcontractors, Hauska responded "I guess I don't specifically. I've been told." At no point during the depositions of Ancheta or Hauska did Gables' compliance with OSHA or the NFPA come up and it appears in the record that they were not asked about those guidelines.

Taken in totality and in a light most favorable to GCI, the circuit court did not err when it found no genuine dispute of material fact on the issue of GCI's breach of a standard of care because GCI failed to present sufficient evidence to counter this point. We hold that the circuit court properly granted partial summary judgment on the issue of whether GCI breached the standard of care.

**IV.**

43

During its deliberations, the jury sent several questions to the circuit court:

Question 1: Does the waiver of subrogation in the [VSA] only apply to insurance coverage/claims, that is specifically, $10 million? ([Red Coats] Insurance payout)

Question 2: Is [GCI] a subsidiary/affiliate of [GRSI]?

Question 3: How many pages are included in the contract between [Red Coats] and [GCI] (RC Exhibits 4 and 5)?

Question 4: Is that the only agreement/contract between [Red Coats] and [GCI] (Exhibits RC 4 and 5)?

Question 5: How do we decide Question 3:

- Can we base the amount on assignment of blame or

- Does it need to be a percentage of the full settlement ($14 million) or only the insurance payout ($10 million) or the [Red Coats] contribution ($4 million)?

Addressing Question 1 the circuit court instructed the jury as follows:

Ladies and gentlemen, you have asked me several questions regarding the waiver of subrogation. The specific questions that you have asked me are questions of fact. You must decide these questions based on the evidence that was presented at trial. I cannot answer these specific factual questions for you.

For guidance, however, along with all of the other instructions that I've given you - so this is simply a supplement, it doesn't replace or displace - it is supplementary, I want to tell you as follows. As you know, [GCI] contends that [Red Coats] and Ms. Shelton may not recover for any monies that they paid to Upper Rock by reason of a waiver of subrogation. [GCI] contends that there is a contract to that effect, and this contract bars any contribution claim. [Red Coats] and Ms. Shelton disagree. They contend that the parties did not contract to waive subrogation, either in whole or in part, that is, either for any money paid on their behalf to Upper Rock by an insurer or any money that they paid directly to Upper Rock.

I remind you that a waiver of subrogation is an affirmative defense on which [GCI] bears the burden of proof by a preponderance of the evidence.

44

The party with the burden of proof must prove that something is more likely so than not so. If you believe that the evidence on a question of fact that you must decide is evenly balanced, then your finding on that issue must be against the party who has the burden of proving it.

Counsel for Red Coats did not object to this instruction, and counsel for GCI noted an objection to the circuit court's reiteration of the burden of proof.

GCI argues that the circuit court erred in giving ambiguous, misleading, and confusing answers to the jury's questions, specifically regarding the waiver of subrogation. First, GCI avers that the first question asked by the deliberating jury: [d]oes the Waiver of Subrogation in the [VSA] only apply to Red Coats' $10 million insurance payout?" was a legal one. GCI contends that the circuit court should have responded with a clarifying instruction that directly addressed the jury's confusion. GCI states that in its response, the circuit court misstated the law when it said "[Red Coats] contend[s] that the parties did not contract to waive subrogation, either in whole or in part, that is, either for any money paid on their behalf to Upper Rock by an insurer or any money that they paid directly to Upper Rock." GCI avers that subrogation only applies to money paid by an insurer on behalf of its claimant, and that the court erred in telling the jury that the waiver of subrogation could apply to "money . . . paid directly to Upper Rock [by Red Coats][.]"

Next, GCI argues that the circuit court erred in not ruling on the jury's second question as a matter of law. The jury asked whether GCI was an affiliate of GRSI. GCI claims that "uncontroverted evidence at trial" demonstrated that GCI is 100% owned by GRSI. Third, GCI argues that the circuit court erred in not "adequately answering the

45

jury's third question regarding how many pages were in the contract between Red Coats and Gables." GCI argues that it was undisputed that the 2-page VSA and 1-page Extra Coverage/Temporary Service Request Form was the entire contractual relationship between GCI and Red Coats.

Finally, GCI argues that the circuit court erred in responding to the jury's fourth question related to Question #3 on the verdict sheet. The jury asked if it found that Red Coats waived subrogation against GCI, should it determine the amount for which subrogation had been waived. GCI contends that the clear and undisputed answer should have been that the waiver is for the amount covered by insurance, and GCI claims that the circuit court erred not only in failing to rule on that as a matter of law but by failing to address it altogether with supplemental instructions.

Red Coats only addressed the circuit court's response to the jury's first question as it believes that GCI did not preserve this argument for review. Red Coats argues that GCI cannot claim that the circuit court's supplemental instruction was not a correct statement of the law because the instruction followed the Maryland Civil Pattern Jury Instruction 1:14 ("MPJI-Cv") (defining the burden of proof for preponderance of the evidence),[20] and because the court had given the same instruction before.

_____

[20] MPJI-Cv 1:14 Burden of Proof – Preponderance of the Evidence Standard states:

> The party who asserts a claim or affirmative defense has the burden of proving it by what we call the preponderance of the evidence.
>
> In order to prove something by a preponderance of the evidence, a party must prove that it is more likely so than not so. In other words, a

46

When a trial court refuses to give a jury instruction, we ascertain whether that court has abused its discretion. *Bazzle v. State*, 426 Md. 541, 548 (2012) (citation and quotations omitted). Whether the evidence is sufficient to generate the requested instruction in the first instance, however, is a question of law that we review *de novo*. *Fleming v. State*, 373 Md. 426, 433 (2003) (citation omitted). We are charged with reviewing the instructions "in their entirety to determine if reversal is required. The jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and cover adequately the issues raised by the evidence, the defendant has not been prejudiced and reversal is inappropriate." *Id.*

"The main purpose of a jury instruction is to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict." Md. Rule 2-520(a) states that "[t]he court shall give instructions to the jury at the conclusion of all the evidence and before closing arguments and may supplement them at a later time when appropriate." In its discretion, the court may also

preponderance of the evidence means such evidence which, when considered and compared with the evidence opposed to it, has more convincing force and produces in your minds a belief that it is more likely true than not true.

In determining whether a party has met the burden of proof you should consider the quality of all of the evidence regardless of who called the witness or introduced the exhibit and regardless of the number of witnesses which one party or the other may have produced.

If you believe that the evidence is evenly balanced on an issue, then your finding on that issue must be against the party who has the burden of proving it.

47

give opening and interim instructions. Md. Rule 2-520(a). When the jury asks such a question, "courts must respond with a clarifying instruction when presented with a question involving an issue central to the case." Trial courts must avoid giving answers that are "ambiguous, misleading, or confusing." *Battle v. State*, 287 Md. 675, 684-85 (1980) (quoting *Wintrobe v. Hart*, 178 Md. 289, 296 (1940)).

The record reflects that when the circuit court received the jury's second note regarding the waiver of subrogation, it asked the parties about the instruction it should give the jurors. GCI wanted the court to instruct the jury about the preponderance of evidence standard. Conversely, Red Coats wanted the court to tell the jury to revisit the evidence and come to a conclusion. The court noted "the Court of Appeals has made it relatively clear that when I get a question, when a trial court gets a question of this nature from the jury, it is error to simply say, look, I gave you the instructions. Try harder." Counsel for GCI also told the court "I would simply say this is for you to decide and respectfully refer them back to the evidence as they received it, without a prompting instruction."

GCI now argues that the circuit court should have given a more responsive instruction to the jury's first question. Maryland courts have recognized that "too much commentary on the evidence can cross the line into being inappropriate." *Appracio v. State*, 431 Md. 42, 53 (2013). In *Appracio*, the Court of Appeals aptly noted:

> When the jury's question seeks guidance on how to find the facts, however, the judge's response must be more circumscribed, so as not to invade the province of the jury. We have said that: [i]nstructions as to facts and inferences of fact are normally not required. This is because an instruction

48

> regarding particular evidence may have the effect of overemphasizing just one of the many proper inferences that a jury may draw.

*Appracio*, 431 Md. at 53 (internal citations and quotations omitted).

The jury's questions were fact-determinative. As such, the circuit court was well within its discretion to instruct the jury as it did. We discern no abuse of discretion.

## V.

GCI argues that Retana and Rosa's are joint tortfeasors, and that the evidence at trial was sufficient to support a finding by the jury that both Retana and Rosa's were negligent and the proximate causes of the fire. GCI concedes that it owned the mushroom heaters but says that Retana and Rosa's oversaw the placement, use, and operation of the mushroom heaters. GCI also notes that there were no heaters in the hallway when Ancheta performed his last walkthrough of the complex at 4:15 p.m. By this time, GCI notes, there were painters working on the fourth floor of Building G.

Red Coats responds that this Court should decline to reach this issue because Retana and Rosa's are not parties to this appeal. In its reply brief, GCI concedes that the issue of whether it is entitled to a *pro rata* share reduction was not requested at trial. Accordingly, we will not address this claim. *See* Md. Rule 8-131(a) (With the exception of questions as to jurisdiction, "[o]rdinarily, the appellate court will not decide any . . . issue unless it plainly appears by the record to have been raised in or decided by the trial court.").

## VI.

Before instructing the jury, the circuit court gave the parties the opportunity to object or suggest amendments to its jury instructions. At trial, the circuit court denied Gables' request for a superseding cause instruction in the following colloquy:

> MS. RUSSELL: Just for the record (unintelligible) we did request (unintelligible).
>
> THE COURT: I can't hear you. I'm sorry.
>
> MS. RUSSELL: We did request (unintelligible) and superseding cause.
>
> THE COURT: Denied.
>
> MS. RUSSELL: And the judge has ruled on that.
>
> THE COURT: Uh-huh. Okay. Thank You.
>
> (Bench conference concluded).

GCI argues that the circuit court erred in denying its request for a superseding cause instruction because "a reasonable jury could have found that Red Coats' failure to perform a fire watch in Building G on the night of the fire was the superseding cause of the loss," which, it argues would have relieved it of all liability for the fire. GCI argues that the court misapplied the test elucidated in *Pittway Corp. v. Collins*, 409 Md. 218 (2009), by failing to consider (b) through (f) of the *Pittway* Test.[21] Instead, the circuit

---

[21] The test in *Pittway Corp. v. Collins*, 409 Md. 218, 248 (2009) provides:

The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

court determined that factor (a) was not satisfied and did not grant the superseding cause instruction.

Red Coats responds that GCI did not promptly object to the lack of a superseding cause instruction and, instead, that GCI reminded the circuit court that it had not provided a superseding cause instruction. Next, Red Coats avers that GCI has presented us with an "incomplete" superseding cause argument because it failed in its brief to address whether the "harm" was foreseeable, and it misapplied the six-factor test outlined in *Pittway*. Lastly, Red Coats avers that GCI "should have realized that Shelton 'might' not perform an internal walkthrough of the buildings; a reasonable person would not regard it as highly extraordinary that Shelton had not walked the buildings."

If a party requests a particular jury instruction, the court is obligated to instruct the jury as to that party's theory of the case, "provided the requested instruction is supported

---

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

by the facts in evidence and not otherwise adequately covered by other instructions." Md. Rule 2-520; *Sergeant Co. v. Pickett*, 285 Md. 186, 193 (1979); *Mallard v. Earl*, 106 Md. App. 449, 469 (1995) (citations omitted).

When we review a trial court's refusal to give a requested jury instruction, we must determine: (1) whether the court correctly explained the law; (2) whether the law was generated by the evidence given to the jury; and (3) whether instructions provided to the jury answered the substance of the requested jury instruction. *Rustin v. Smith*, 104 Md. App. 676, 679-80 (1995) (citing *E.G. Rock, Inc. v. Danly*, 98 Md. App. 411, 421 (1993)). If evidence in the case does not support that requested instruction, the court should not give it. *Rustin*, 104 Md. App. at 680 (citing *Moats v. Ashburn*, 60 Md. App. 487, 493 (1984)).

Regarding whether the trial court erred in generating a jury instruction on superseding cause, "[Md. Rule 2-520] 'has been interpreted to require that a requested instruction be given only when there is evidence in the record to support it.'" *Hollingsworth & Vose Co. v. Connor*, 136 Md. App. 91, 115 (2000) (quoting *Farley v. Allstate Inc. Co.*, 355 Md. 45, 46-47 (1999)). When reviewing whether the evidence in the record supports the trial court's decision to generate a certain jury instruction, an appellate court must "determine whether . . . [there exists] that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired." *Bazzle*, 426 Md. at 550 (quoting *Dishman v. State*, 352 Md. 279, 292 (1998)).

A superseding cause is said to have "arise[n] primarily when 'unusual' and 'extraordinary' independent intervening negligent acts occur that could not have been anticipated by the original tortfeasor." *Pittway*, 409 Md. at 249. The Court of Appeals has also noted that Section 442 of the Restatement (Second) of Torts establishes the test that has been applied in Maryland courts for determining when an intervening negligent act rises to the level of a superseding cause:

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Id.* at 248.

Applying this test to the case at bar, it is apparent that the circuit court did not abuse its discretion in failing to give a superseding cause instruction. First, Red Coats' alleged failure to patrol inside of the building did not bring about "harm different in kind" than that which would have resulted from GCI's negligence. Namely, the fire.

53

While Red Coats would have learned about the mushroom heaters in the hallway, GCI did not provide evidence that Red Coats or its employees had any knowledge of 1) how to operate the mushroom heaters, 2) that the mushroom heaters were near combustible materials, or 3) knew GCI's oral instructions and/or contract related to the mushroom heaters being non-operational at night. Based on those facts alone, a jury would not have inferred that Red Coats' failure to supervise in the building, given the evidence that GCI never directed Red Coats to patrol inside of Building G, was the superseding cause of the fire that damaged Building G. Thus, we find that the circuit court properly refused to instruct the jury on superseding cause.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID 75% BY APPELLEE AND 25% BY APPELLANT.**